## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
*Electronically Filed*

| | |
|---|---|
| PAUL ONESTI, Derivatively and on Behalf of TEMPUR SEALY INTERNATIONAL, INC., <br><br> Plaintiff, <br><br> vs. <br><br> SCOTT L. THOMPSON, BARRY A. HYTINEN, EVELYN S. DILSAVER, JOHN A. HEIL, JON L. LUTHER, USMAN NABI, RICHARD W. NEU, and ROBERT B. TRUSSELL JR., <br><br> Defendants, <br><br> and <br><br> TEMPUR SEALY INTERNATIONAL, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br><br> <u>JURY TRIAL DEMANDED</u> |

Plaintiff Paul Onesti ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Tempur Sealy International, Inc. ("Tempur Sealy" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Scott L. Thompson, Barry A. Hytinen, Evelyn S. Dilsaver, John A. Heil, Jon L. Luther, Usman Nabi, Richard W. Neu, and Robert B. Trussell Jr. (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Tempur Sealy, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. The allegations in this Complaint are made upon Plaintiff's personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents,

conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Tempur Sealy, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by certain of Tempur Sealy's directors and officers starting on July 28, 2016 and through the present (the "Relevant Period").

2. Tempur Sealy is the world's largest bedding manufacturer. The Company develops, manufactures, and distributes bedding products that are sold worldwide in approximately 100 countries. The Company has several product lines ranging from value to luxury, with brand names including TEMPUR®, Tempur-Pedic®, Stearns & Foster®, Sealy®, and Sealy Posturepedic®.

3. Mattress Firm Holding Corp. ("Mattress Firm") was Tempur Sealy's largest customer prior to and during a significant portion of the Relevant Period, and accounted for approximately 25% and 21% of the Company's overall net sales for 2015 and 2016, respectively.

4. On August 7, 2016, Steinhoff International Holdings NV ("Steinhoff") agreed to acquire Mattress Firm for approximately $2.4 billion, with the acquisition becoming effective on September 16, 2016. Mattress Firm's business was disrupted in connection with the acquisition, due in part to its rebranding and merchandising of 1,000 of its Sleepy stores.

5. On January 30, 2017, prior to the opening of the market, Tempur Sealy issued a press release announcing that representatives of Steinhoff and the senior management of Mattress Firm had notified the Company of their intent to terminate all U.S. contracts with Tempur Sealy if

2

the Company did not agree to "significant economic concessions" and further considerable modifications to the existing agreements between Mattress Firm and Tempur Sealy.  Moreover, the press release stated that after a resolution of the matter was not able to be reached by the parties, Tempur Sealy issued formal termination notices, effective January 27, 2017, to Mattress Firm for all of Tempur Sealy's brands, and that the Company expected to end business with Mattress Firm in the first fiscal quarter 2017.

6.      On this news, the price per share of Tempur Sealy stock fell $17.70, or over 28%, from its closing price on the previous day the market was open to close at $45.49 on January 30, 2017.

7.      On March 30, 2017, Mattress Firm filed a lawsuit in the District Court of Harris County, Texas against Tempur-Pedic and Sealy Mattress (two wholly-owned subsidiaries of Tempur Sealy), alleging breach of contract and tortious interference and seeking a declaratory judgment with respect to the interpretation of its agreements with the Company.

8.      During the Relevant Period, the Individual Defendants made and/or caused the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, and prospects.  Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) Mattress Firm had been engaged in active negotiations to be acquired, and its acquisition was reasonably likely to have a material adverse effect on the Company's operating results for the third and fourth fiscal quarters of 2016; (2) Tempur Sealy had engaged in active discussions with Mattress Firm with regard to modifications to the long-term supply agreements between them; (3) Mattress Firm sought significant economic concessions from the Company; (4) the Company lacked a reasonable basis for the positive

statements it made about its business, operations, and prospects, particularly those related to Mattress Firm; and (5) the Company failed to maintain effective internal controls.  As a result of the foregoing, the Company's public statements were materially false and misleading and its positive statements about the Company's business, operations, and prospects lacked a reasonable basis at all relevant times.

9.      The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.  While the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact, one of the Individual Defendants engaged in lucrative insider sales.

10.      Moreover, due to the artificial inflation of the Company's stock price caused by the foregoing misrepresentations, for the repurchases of the Company's own common stock during the Relevant Period, which repurchase was caused by the Individual Defendants, the Company paid at least $56 million more than the stock was worth.

11.      The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

12.      In light of the Individual Defendants' misconduct, which has subjected Tempur Sealy, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Federal Securities Class Action"), the need to undertake internal investigations, the losses from the waste of corporate assets, including from overpaying for repurchases of Company stock, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who

benefitted from the wrongdoing alleged herein, the Company expended and will have to expend many millions of dollars.

13.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and certain Individual Defendants' liability in the Federal Securities Class Action, their being beholden to each other, their longstanding business and personal relationship with each other, and their not being disinterested and/or independent directors, a majority of the Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332.  Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

15.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of Kentucky or who has minimum contacts with this District to justify the exercise of jurisdiction over them.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

16.     Plaintiff is a current shareholder of Tempur Sealy.  Plaintiff has been a shareholder of, and has continuously held, Tempur Sealy common stock at all relevant times.  Plaintiff is a citizen of Illinois.

**Nominal Defendant Tempur Sealy**

17.     Tempur Sealy is a Delaware corporation with its principal executive offices at 1000 Tempur Way, Lexington, Kentucky 40511.  Tempur Sealy's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "TPX."

**Defendant Thompson**

18.     Defendant Scott L. Thompson ("Thompson") has served as the Company's CEO, President, and Chair of the Board since September 2015.  According to the Company's Schedule 14A filed with the SEC on March 21, 2016 (the "2016 Proxy Statement"), as of March 9, 2016, Defendant Thompson beneficially owned 69,686 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 9, 2016 was $58.91, Thompson owned over $4.10 million worth of Tempur Sealy stock.

19.     For the fiscal year ended December 31, 2016, Defendant Thompson received $6,237,174 as compensation from the Company, which included $1,100,000 as base salary, $3,181,573 in stock awards, $1,934,625 in non-equity incentive plan compensation, and $20,976 in all other compensation.

20.     The Company's Schedule 14A filed with the SEC on March 27, 2017 (the "2017 Proxy Statement") stated the following about Defendant Thompson:

*Scott L. Thompson,*[1] 58, has served as Chairman of Tempur Sealy International's Board of Directors and as its President and Chief Executive Officer since September 2015. He previously served as Chief Executive Officer and President of Dollar Thrifty Automotive Group, Inc., until it was purchased by Hertz Global Holdings, Inc. in 2012. Prior to serving as CEO and President, Mr. Thompson was

---

[1] Throughout this Complaint, emphasis is contained in the original unless otherwise noted.

6

a Senior Executive Vice President and Chief Financial Officer of Dollar Thrifty. Prior to joining Dollar Thrifty in 2008, Mr. Thompson was a consultant to private equity firms, and was a founder of Group 1 Automotive, Inc., a NYSE and Fortune 500 company, serving as its Senior Executive Vice President, Chief Financial Officer and Treasurer. Mr. Thompson presently serves as a member of the Board of Directors for Asbury Automotive Group, Inc., a public automotive retailer. Mr. Thompson earned a Bachelor of Business Administration degree from Stephen F. Austin State University in Nacogdoches, Texas, and began his career with a national accounting firm. Mr. Thompson brings extensive financial, operational and entrepreneurial experience to the Board in his roles as an executive officer and director of publicly traded companies.

21.    Defendant Thompson is a citizen of Kentucky.

**Defendant Hytinen**

22.    Defendant Barry A. Hytinen ("Hytinen") has served as the Company's Executive Vice President and CFO since July 2015.  According to the Company's 2016 Proxy Statement, as of March 9, 2016, Defendant Hytinen beneficially owned 33,883 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 9, 2016 was $58.91, Hytinen owned over $1.99 million worth of Tempur Sealy stock.

23.    For the fiscal year ended December 31, 2016, Defendant Hytinen received $3,341,942 as compensation from the Company, which included $460,000 as base salary, $1,962,283 in stock awards, $453,054 in non-equity incentive plan compensation, a $450,000 bonus, and $16,605 in all other compensation.

24.    The Company's 2017 Proxy Statement stated the following about Defendant Hytinen:

> *Barry A. Hytinen* was appointed to serve as Executive Vice President and Chief Financial Officer of Tempur Sealy International in July 2015. Since joining the Company in June 2005, Mr. Hytinen has served in a range of finance, corporate development, financial planning and investor relations roles, most recently as Executive Vice President, Corporate Development and Finance. Prior to joining the Company, Mr. Hytinen served as Chief Financial Officer of a venture-backed software company. Earlier in his career, he held finance and corporate development

7

positions at Vignette and General Electric. Mr. Hytinen earned an M.B.A. from Harvard Business School and holds a B.S. in Finance and Political Science from Syracuse University.

25.     Defendant Hytinen is a citizen of Kentucky.

**Defendant Dilsaver**

26.     Defendant Evelyn S. Dilsaver ("Dilsaver") has served as a Company director since December 2009.  She is also Chair of the Audit Committee and a member of the Nominating and Corporate Governance Committee.  According to the Company's 2016 Proxy Statement, as of March 9, 2016, Defendant Dilsaver beneficially owned 29,890 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 9, 2016 was $58.91, Dilsaver owned over $1.76 million worth of Tempur Sealy stock.

27.     For the fiscal year ended December 31, 2016, Defendant Dilsaver received $230,156 as compensation from the Company, which included $98,000 in fees earned or cash paid and $130,000 in stock awards.[2]

28.     The Company's 2017 Proxy Statement stated the following about Defendant Dilsaver:

> *Evelyn S. Dilsaver,* 61, has served as a member of Tempur Sealy International's Board of Directors since December 2009. Ms. Dilsaver was President and Chief Executive Officer of Charles Schwab Investment Management from July 2004 until September 2007. Prior to that, Ms. Dilsaver held various senior management positions with The Charles Schwab Corporation since December 1991, including Executive Vice President and Senior Vice President, Asset Management Products and Services, of Charles Schwab Investment Management and Chief Financial Officer for U.S. Trust Company. Ms. Dilsaver is also a member of the board of directors of Aeropostale, Inc., a clothing retailer, HealthEquity, Inc., a non-bank health savings trustee, Bailard Private Real Estate Fund, as well as Blue Shield of California and other non-profit boards. She also serves as a member of the advisory

---

[2] The Directors' compensation as listed herein is drawn from the Company's 2017 Proxy Statement.  The calculations therein for total compensation received by Defendants Dilsaver, Heil, Luther, Neu, and Trussell appear to correctly include the cash compensation and the value of the stock awards, but incorrectly include the number of shares of such stock awards, as though the number of those shares was an amount of money.  The Director compensation figures presented in this complaint nonetheless utilize the figures as stated in the 2017 Proxy Statement.

board of Protiviti, a global consulting company. In the past five years, Ms. Dilsaver has also served as a director of HighMark Funds, an asset management firm, Longs Drugs, a retail pharmacy chain, and Tamalpais Bancorp. Ms. Dilsaver is a certified public accountant and holds a B.S. degree in accounting from California State University-Hayward. Ms. Dilsaver brings a long professional career in finance, accounting and general management and considerable experience with consumer-oriented businesses to the Board as a senior executive of a large investment management firm and her many years of serving as a director of companies in a variety of businesses.

29.     Upon information and belief, Defendant Dilsaver is a citizen of California.

**Defendant Heil**

30.     Defendant John A. Heil ("Heil") has served as a Company director since March 2008.  He is also Chair of the Nominating and Corporate Governance Committee and a member of the Audit Committee.  According to the Company's 2016 Proxy Statement, as of March 9, 2016, Defendant Heil beneficially owned 30,024 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 9, 2016 was $58.91, Heil owned over $1.76 million worth of Tempur Sealy stock.

31.     For the fiscal year ended December 31, 2016, Defendant Heil received $218,601 as compensation from the Company, which included $86,445 in fees earned or cash paid and $130,000 in stock awards.

32.     The Company's 2017 Proxy Statement stated the following about Defendant Heil:

*John A. Heil,* 64, has served as a member of Tempur Sealy International's Board of Directors since March 2008. From February 2005 until his retirement in April 2013, he served as President of United Pet Group, Inc., a global manufacturer and marketer of pet food/supplies and a subsidiary of Spectrum Brands, Inc. Spectrum Brands, Inc. filed a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code in February 2009 and emerged from bankruptcy protection on August 28, 2009. From 2000 to February 2005 he served as United Pet Group's President and Chief Executive Officer. Mr. Heil has been a member of the board of directors and a member of the audit committee of VCA Antech, Inc., a NYSE listed company, since February 2002, and previously served as a director of that company from 1995 to 2000. Prior to joining United Pet Group, Mr. Heil spent twenty-five years with the H.J. Heinz Company in various executive and general management positions including President of Heinz Pet Products. Mr. Heil

holds a B.A. degree in economics from Lycoming College. Mr. Heil's long career in management and the branded consumer products arena brings a remarkable depth of operational and strategic experience to the Board.

33.      Upon information and belief, Defendant Heil is a citizen of Kentucky.

**Defendant Luther**

34.      Defendant Jon L. Luther ("Luther") has served as a Company director since May 2015.  He is also Chair of Compensation Committee and a member of the Nominating and Corporate Governance Committee.  According to the Company's 2016 Proxy Statement, as of March 9, 2016, Defendant Luther beneficially owned 7,793 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 9, 2016 was $58.91, Luther owned over $459,085 worth of Tempur Sealy stock.

35.      For the fiscal year ended December 31, 2016, Defendant Luther received $208,601 as compensation from the Company, which included $76,445 in fees earned or cash paid and $130,000 in stock awards.

36.      The Company's 2017 Proxy Statement stated the following about Defendant Luther:

*Jon L. Luther,* 73, has served as a member of Tempur Sealy International's Board of Directors since May 2015. He served as Chief Executive Officer of Dunkin' Brands from January 2003 to January 2009 and Chairman from March 2006 to January 2009. In January 2009, he assumed the role of Executive Chairman and became non-Executive Chairman from July 2010 until his retirement in May 2013. Prior to Dunkin' Brands, Mr. Luther was President of Popeyes, a division of AFC Enterprises, from February 1997 to December 2002. Prior to Popeyes, Mr. Luther served as President of CA One Services, a subsidiary of Delaware North Companies, Inc., a global food service and hospitality company, and served as President and CEO of Benchmark Services, Inc., a food services company he founded. Earlier in his career, Mr. Luther held various leadership positions at Marriott Corporation and ARAMARK. Mr. Luther is a member of the board of directors of Six Flags Entertainment Corporation and Arby's Restaurant Group. Mr. Luther holds a degree in hotel and restaurant management from Paul Smith's College. Mr. Luther brings a strong track record of profitably growing large global consumer branded businesses, with a keen understanding of the consumer, and

notable brand development expertise. He has significant relevant experience as a CEO and as a director of other high-performance public companies.

37.     Upon information and belief, Defendant Luther is a citizen of Massachusetts.

**Defendant Nabi**

38.     Defendant Usman S. Nabi ("Nabi") has served as a Company director since May 2015.  He is also a member of the Compensation Committee and a member of the Nominating and Corporate Governance Committee.

39.     The Company's 2017 Proxy Statement stated the following about Defendant Nabi:

*Usman S. Nabi,* 42, has served as a member of Tempur Sealy International's Board of Directors since May 2015. Mr. Nabi is a Senior Partner at H Partners, an investment management firm and Tempur Sealy International's largest stockholder. Before joining H Partners in 2006, Mr. Nabi was at Perry Capital, the Carlyle Group, and Lazard Freres. Mr. Nabi serves on the Board of Directors of Six Flags Entertainment. Mr. Nabi received his A.B. degree from Harvard College and an M.B.A. degree from Stanford University Graduate School of Business. Mr. Nabi brings a strong business and financial background and extensive investment experience to the Board.

40.     Defendant Nabi is a Senior Partner at H Partners, which, as of March 15, 2017, beneficially owned 7,000,000, or 11.2%, of the Company's issued and outstanding common stock, making it Tempur Sealy's second largest stockholder.  Per the 2016 and 2017 Proxy Statements, Defendant Nabi may be deemed to have voting and dispositive power with respect to H Partners' shares, but he disclaims beneficial ownership of these shares, except to the extent of his pecuniary interest.

41.     Upon information and belief, Defendant Nabi is a citizen of New York.

**Defendant Neu**

42.     Defendant Richard W. Neu ("Neu") has served as a Company director since May 2015, and currently serves as Lead Director.  He is also a member of the Audit Committee and a member of the Compensation Committee.  According to the Company's 2016 Proxy Statement, as

of March 9, 2016, Defendant Neu beneficially owned 21,112 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 9, 2016 was $58.91, Neu owned over $1.24 million worth of Tempur Sealy stock.

43.     For the fiscal year ended December 31, 2016, Defendant Neu received $237,736 as compensation from the Company, which included $70,000 in fees earned or cash paid and $165,000 in stock awards.

44.     The Company's 2017 Proxy Statement stated the following about Defendant Neu:

*Richard W. Neu,* 61, has served as a member of Tempur Sealy International's Board of Directors since October 2015. Mr. Neu's professional career has spanned over 35 years. For the last 11 years Mr. Neu has served in a variety of Board roles. Mr. Neu currently serves on the board of directors, as chair of the audit committee and as a member of the executive and integration risk oversight committees of Huntington Bancshares Incorporated, and as a member of the board of directors of TICC Capital Corp. Until the sale of the company in 2012, he was the lead director and a member of the audit committee and governance committee of Dollar Thrifty Automotive Group, Inc., having served as the chairman of the Dollar Thrifty board of directors from 2010 through 2011. Mr. Neu also served as a director of MCG Capital Corporation, a private equity firm, from 2007 until its sale in 2015, and during this period served as chairman of the board from 2009 to 2015 and as Chief Executive Officer from November 2011 to November 2012. Mr. Neu served from 1985 to 2004 as Chief Financial Officer of Charter One Financial, Inc., a major regional bank holding company, and a predecessor firm, and as a director of Charter One Financial, Inc. from 1992 to August 2004. Mr. Neu previously worked for KPMG. Mr. Neu received a B.B.A. from Eastern Michigan University with a major in accounting. Mr. Neu has extensive knowledge and experience handling complex financial and operational issues through his service as both a director and executive officer of a variety of public companies.

45.     Upon information and belief, Defendant Neu is a citizen of Virginia.

**<u>Defendant Trussell</u>**

46.     Defendant Robert B. Trussell, Jr. ("Trussell") has served as a Company director since 2002.  According to the Company's 2016 Proxy Statement, as of March 9, 2016, Defendant Trussell beneficially owned 60,299 shares of the Company's common stock.  Given that the price

per share of the Company's common stock at the close of trading on March 9, 2016 was $58.91, Trussell owned over $3.55 million worth of Tempur Sealy stock.

47.     For the fiscal year ended December 31, 2016, Defendant Trussell received $202,156 as compensation from the Company, which included $70,000 in fees earned or cash paid and $130,000 in stock awards.

48.     The Company's 2017 Proxy Statement stated the following about Defendant Trussell:

> *Robert B. Trussell, Jr.,* 65, has served as a member of Tempur Sealy International's Board of Directors or its predecessors since 2002. Mr. Trussell served as Chief Executive Officer of Tempur Sealy or its predecessor from November 2002 until his retirement in May 2006. From 1994 to December 2004, Mr. Trussell served as President of the Company and its predecessors. Prior to joining the Company's predecessor in 1994, Mr. Trussell was general partner of several racing limited partnerships that owned racehorses in England, France and the United States. He was also the owner of several start-up businesses in the equine lending and insurance business. Mr. Trussell received his B.S. degree from Marquette University. As former Chief Executive Officer and a principal founder of Tempur Sealy, Mr. Trussell brings significant management and mattress industry experience and an historical perspective to the Board.

49.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Trussell made the following sale of Company stock.  On August 2, 2016, Defendant Trussell sold 5,000 shares of Company stock for $75.50 per share, receiving in total $377,500.  His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

50.     Upon information and belief, Defendant Trussell is a citizen of Kentucky.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

51.     By reason of their positions as officers, directors, and/or fiduciaries of Tempur Sealy and because of their ability to control the business and corporate affairs of the Company, the

Individual Defendants owed Tempur Sealy and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Tempur Sealy in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Tempur Sealy and its shareholders so as to benefit all shareholders equally.

52.     Each director and officer of the Company owes to Tempur Sealy and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

53.     To discharge their duties, the officers and directors of Tempur Sealy were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

54.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Tempur Sealy, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Board at all relevant times.

14

55.     To discharge their duties, the officers and directors of Tempur Sealy were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Tempur Sealy were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Kentucky, the United States, the markets in which the Company operates, and pursuant to Tempur Sealy's own Corporate Governance Guidelines and its own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Tempur Sealy conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Tempur Sealy and procedures for the reporting of the business and internal affairs to the board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Tempur Sealy's operations would comply with all applicable laws and Tempur Sealy's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

       (f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

       (g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

       (h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

56.     Each of the Individual Defendants further owed to Tempur Sealy and the shareholders the duty of loyalty requiring that each favor Tempur Sealy's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

57.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Tempur Sealy and were at all times acting within the course and scope of such agency.

58.     Because of their advisory, executive, managerial, and directorial positions with Tempur Sealy, each of the Individual Defendants had access to adverse, non-public information about the Company.

59.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Tempur Sealy, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Tempur Sealy.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

60.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

61.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) to conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price while the Company repurchased its own stock and the Individual Defendants received lucrative salaries, bonuses, fees, and stock and one of them engaged in lucrative insider sales.

62.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Tempur Sealy was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

63.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted the

17

accomplishment of that wrongdoing, and was or should have been aware of his overall contribution

to and furtherance of the wrongdoing.

64.     At all times relevant hereto, each of the Individual Defendants was the agent of

each of the other Individual Defendants and of Tempur Sealy, and was at all times acting within

the course and scope of such agency.

## TEMPUR SEALY'S CORPORATE GOVERNANCE GUIDELINES

65.     The Company's Corporate Governance Guidelines (the "Governance Guidelines")

"provide a framework for the corporate governance of the Company," and applies to the Board.

66.     The Governance Guidelines provide, as to "Director Responsibilities," that:

The basic responsibility of the directors is to exercise their business judgment to
act in what they reasonably believe to be the best interests of the Company and its
shareholders. In discharging that obligation, directors are entitled to rely on the
honesty and integrity of the Company's senior executives and its outside advisors
and auditors.

\* \* \*

Directors are expected to attend Board meetings and meetings of committees on
which they serve, and to spend the time needed and meet as frequently as necessary
to properly discharge their responsibilities. Directors are generally expected to
attend annual stockholder meetings. Information and data that are important to the
Board's understanding of the business to be conducted at a Board or committee
meeting should generally be distributed in writing to the directors before the
meeting, and directors should review these materials in advance of the meeting.

\* \* \*

If the Chairman of the Board and Chief Executive Officer are the same person, the
independent members of the Board of Directors will annually elect an independent
Director to serve as Lead Director. The Lead Director presides at any Board
meeting at which the Chairman is not present and is actively involved with Board
leadership activities and Board committee actions. Duties specific to the Lead
Director are determined by the Nominating & Corporate Governance Committee
and are outlined in the Lead Director Charter.

\* \* \*

The Board believes that the management speaks for the Company. Individual Board members may, from time to time, meet or otherwise communicate with various constituencies that are involved with the Company, such as bankers, lenders, attorneys, auditors, and consultants. However, it is expected that Board members will do this with the knowledge of the management and, absent unusual circumstances or as contemplated by the committee charters and except for communications with bankers, lenders, attorneys, auditors, and consultants and other service providers in connection with the Board's activities, only at the request of management.

67.     The Governance Guidelines require the Board to exercise their business judgment to act in what they reasonably believe to be the best interests of the Company and its shareholders. The members of the Board did not comply with the requirements of the Governance Guidelines. The Board violated the Governance Guidelines because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements and omissions alleged herein, failed to maintain adequate internal controls, and engaged in, or facilitated other Individual Defendants engagement in sales of Company stock on non-public material information. Such misconduct cannot reasonably be said to be in the best interest of the Company and its shareholders. Thus, the misconduct of the Individual Defendants that are directors, as outlined herein, constitutes a breach of the Governance Guidelines.

**TEMPUR SEALY'S CODE OF BUSINESS CONDUCT AND ETHICS**

68.     Pursuant to Tempur Sealy's Code of Business Conduct and Ethics (the "Code of Ethics"), which every Company employee is expected to read and sign, "[a]ll employees, executive officers, and members of the Board of Directors must know and comply with all Company policies that apply to their jobs and report any suspected violations of law or the Company's policies." Moreover, the Code of Ethics "reflects the commitment of [the Company] . . . and its employees, executive officers, and members of the Board of Directors to conduct [its] business lawfully and with unquestionable integrity."

69.     The Code of Ethics provides, as to "Lawful and Ethical Behavior," that:

Lawful and ethical behavior is critical to our continued success. It is required. You must comply with those laws and regulations relating to your business conduct. In addition, you must avoid and report any activity that involves, or could lead to the involvement of, the Company in any potentially unlawful practice.

* * *

In addition to complying with the law, you must adhere to the ethical and other standards set forth in this Code. Tempur Sealy strives to conduct all of its business activities in a manner consistent with the highest standards of integrity and ethical behavior. You are expected to demonstrate an uncompromising degree of integrity, responsibility and professional conduct in the performance of your responsibilities . . . . You must never take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other such intentional practice. Nor should you participate in or facilitate any illegal conduct by others.

70.     The Code of Ethics provides, as to "Conflicts of Interest," that:

employees, executive officers, and members of the Board of Directors must avoid activities or situations that present a potential conflict between their personal interests and the interests of Tempur Sealy. Employees, executive officers, and members of the Board of Directors owe Tempur Sealy their loyalty, and should therefore avoid any interest, investment or association that interferes with the independent exercise of sound judgment in the best interests of Tempur Sealy. Also, any activity or situation that appears to create a conflict of interest must be avoided.

71.     The Code of Ethics provides, as to "Protection and Proper Use of Company Assets,"

that:

Each employee, executive officer or member of the Board of Directors is a steward of the Company's assets, and as such, has an obligation to protect and preserve corporate assets and to seek to ensure their efficient use. Theft, carelessness, and waste have a direct and negative impact on the Company's profitability. All corporate assets must be used for legitimate business purposes only.

72.     The Code of Ethics provides, as to "Accuracy of Company Records and Retention,"

that:

Adequate records are maintained to meet our financial, legal, regulatory and operational objectives and requirements. Most Tempur Sealy employees and contractors are involved with reports and documents of some kind, such as

preparing time sheets, expense statements or hours of service logs, approving invoices, reporting customer information, signing for receipt of purchased materials or preparing inventory reports. While we all may not need to be familiar with accounting procedures, we do need to make sure that every business record is accurate, complete and reliable. Falsification or unauthorized destruction of any company document or record, whether on paper, tape, disk, video, electronic media or in any other format, will not be tolerated.

Tempur Sealy maintains a system of internal controls that, among other things, ensures the integrity and accuracy of Tempur Sealy business and financial records. You must comply with the internal control requirements applicable to your job and make sure that all of the business records for which you are responsible are truthful and accurately reflect the transactions being recorded. Unrecorded or "off-the-books" funds or assets must not be kept for any purpose. Where applicable to your job, you should routinely compare written records of assets to actual assets. False, misleading or incomplete information impairs our ability to make good decisions, undermines trust in the long term, and may in some cases be illegal. You must also ensure that only authorized persons execute transactions on behalf of Tempur Sealy or have access to Tempur Sealy assets. Please consult the finance or internal audit departments when you have questions regarding Tempur Sealy internal controls.

73.    The Code of Ethics provides, as to "Responsibility With Respect to Public Disclosures," that:

We are committed to providing full, fair, accurate, timely and understandable disclosure in our public communications and in the reports and documents that we file with regulatory authorities, including the U.S. Securities and Exchange Commission (SEC). Strict compliance with both the spirit and the letter of the law governing public disclosures and reporting to the SEC is required. Our disclosures will enable our stockholders to understand (i) the key business opportunities we see, (ii) the issues and risks we manage, (iii) the critical accounting policies we employ and (iv) the important judgments we make in preparing our financial statements.

Only certain Tempur Sealy employees are authorized to release information about Tempur Sealy as part of their regular duties, subject to our established procedures. Otherwise, you must never release information concerning Tempur Sealy or its business activities without prior, written approval from Tempur Sealy's legal department.

When you have any concern regarding questionable accounting, internal accounting controls or auditing matters relating to Tempur Sealy, you are required to report it. Examples of such concerns include:

- Fraud or deliberate error in the preparation, evaluation, review or audit of any Tempur Sealy financial statement;

- Fraud or deliberate error in the recording and maintaining of Tempur Sealy financial records;

- Deficiencies in, or noncompliance with, Tempur Sealy internal accounting controls;

- Misrepresentation or false statement to, or by, a senior officer or accountant regarding a matter contained in Tempur Sealy financial records, financial reports or audit reports; or

- Deviation from full and fair reporting of the financial condition of Tempur Sealy.

74.     The Code of Ethics provides, as to "Insider Information and Trading," that:

It is illegal and unethical to buy or sell securities, or tip others to trade, while in possession of material non-public information about that security (sometimes called "Inside Information") or to communicate such information to others who trade on the basis of such information (commonly known as "tipping"). Material non-public information is any information about a company (Tempur Sealy, our vendors or customers) that a reasonable investor would consider significant in deciding whether to buy, hold or sell the security. Information is non-public until it has been effectively communicated by the Company to, and absorbed by, the marketplace through a press release or other appropriate manner. Whether a particular piece of information is "material" or "non-public" will be judged with 20-20 hindsight. When an employee, executive officer or member of the Board of Directors has any doubt about whether or not they have material, non-public information, they should assume that it is material and has not been disclosed to the public. Do not hesitate to consult Tempur Sealy's legal department with any questions you may have.

Additionally, employees, executive officers or members of the Board of Directors (and their immediate family members) are prohibited from involvement in any transaction (including a sale, a purchase, a gift, a loan or pledge or hedge, a contribution to a trust or any other transfer) in Tempur Sealy shares during company-imposed "blackout periods." In addition, certain officers and members of the Board of Directors are required to obtain prior clearance from Tempur Sealy's Chief Financial Officer prior to engaging in any transactions involving Tempur Sealy securities.

75.     The Code of Ethics provides, as to "Compliance," that:

It is the responsibility of each employee, executive officer and member of the Board of Directors to comply with this Code. Failure to comply with this Code and the associated Company policies may result in disciplinary action, including termination of employment with the Company (or, in the case of a director, a decision not to re-nominate), referral for criminal prosecution, and reimbursement of any of the Company's losses or damages resulting from such violation. Compliance with this Code includes the responsibility to report promptly any violation or apparent violation of the provisions of this Code. At the time an employee, executive officer or director commences service and periodically during their term of service, each such person will be asked to review and certify as to their compliance with this Code.

76.     The Code of Ethics provides, as to "Enforcement," that:

It is our policy to prevent the occurrence of unethical or unlawful behavior, to immediately stop any such behavior that is detected and to discipline persons who engage in such behavior. We will also discipline managers who fail to exercise appropriate supervision and oversight, thereby allowing such behavior to go undetected.

Deviating from the guidelines set forth in this Code or in other Tempur Sealy policies can have severe consequences for both the individuals involved and Tempur Sealy. Conduct that violates the guidelines set forth in this Code or in other Tempur Sealy policies constitutes grounds for disciplinary action, up to and including termination of employment or engagement. In some cases, criminal and civil prosecution may also be pursued.

* * *

Each member of Tempur Sealy management is responsible for ensuring compliance with this Code, and all other applicable policies and procedures, within the area of his or her responsibility

77.     The Code of Ethics requires the Individual Defendants to adhere to Tempur Sealy's standards of business conduct and requires all employees, officers and directors to avoid activities that are unlawful or conflict with the Company's policies.  The Individual Defendants violated the Code of Ethics because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements and omissions alleged herein, failed to maintain adequate internal controls, and engaged in, or facilitated one of the other Individual Defendants' engagement in sales of Company stock on non-public material

23

information.  Thus, the Individual Defendants' misconduct, as outlined herein, constitutes a breach

of the Code of Ethics.

## **TEMPUR SEALY'S AUDIT COMMITTEE CHARTER**

78.     Pursuant to its Charter, the Audit Committee is tasked with specific responsibilities

and duties.  The Audit Committee Charter provides, as to the Audit Committee's "Purposes," that:

> The Committee shall assist the Board in overseeing the integrity of the Company's
> financial statements, the Company's compliance with legal and regulatory
> requirements, the independent auditor's qualifications and independence, the
> performance of the Company's independent auditors, and the responsibility,
> function, and performance of the Company's internal auditors and audit function.

79.     The Audit Committee Charter provides, as to "Duties and Responsibilities," that:

> The primary responsibility of the Committee is to select and appoint the
> independent auditor, oversee the Company's financial reporting process on behalf
> of the Board and report the results of its activities to the Board. Management is
> responsible for preparing the Company's financial statements, and the independent
> auditor is responsible for auditing those financial statements. The Committee, in
> carrying out its responsibilities, believes its policies and procedures should remain
> flexible, in order to best react to changing conditions and circumstances. The
> Committee should take the appropriate actions to set the overall corporate "tone"
> for quality financial reporting, sound business risk practices and ethical behavior.

80.     The Audit Committee Charter provides, as to duties "Relating to Audits and

Financial Statements," that:

- The Committee shall discuss with the independent auditor the overall scope
  and plans for the annual audit. In addition, the Committee shall discuss with
  management, the independent auditor, and the internal auditor the adequacy
  and effectiveness of the accounting and financial controls, including the
  Company's system to monitor and manage business risk, and legal and
  ethical compliance programs.

- The Committee shall review with management and the independent auditor
  (i) the audited financial statements to be included in the Company's Annual
  Report on Form 10-K, including its judgment as to the quality, and not only
  the acceptability, of accounting principles, the reasonableness of significant
  judgments and the clarity of the disclosures in the financial statements; and
  (ii) the "Management's Discussion and Analysis" section proposed to be
  included in the Form 10-K. The Committee also shall discuss the results of

24

the annual audit and any other matters required to be communicated to the Committee by the independent auditor under the rules of the Public Company Accounting Oversight Board (United States) ("PCAOB") or the Commission. Based on the foregoing and on review of other information made available to the Committee, the Committee shall recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K. In addition, the Committee shall prepare annually a report to the stockholders of the Company, as required by the rules of the Commission.

- The Committee shall similarly review with management and the independent auditor the interim financial statements and the "Management's Discussion and Analysis" section proposed to be included in the Form 10-Q prior to the filing of each of the Company's Quarterly Reports on Form 10-Q. The Committee also shall discuss the results of the quarterly review and any other matters required to be communicated to the Committee by the independent auditor under the rules of the PCAOB or the Commission. The Chair of the Committee may represent the entire Committee for the purposes of this review.

* * *

- The Committee shall review the disclosures made by officers of the Company in the certification required to be filed (a) as part of the Company's Annual Reports on Form 10-K and Quarterly Reports on Form 10-Q, regarding any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls and (b) pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, regarding the compliance of periodic reports and their fair presentation of the Company's financial statements and results of operations.

- The Committee shall review the plans for and compliance with Section 404 of the Sarbanes-Oxley Act for "Management Assessment of Internal Control over Financial Reporting" including reviewing the results of Management's assessment and reviewing the results of the independent auditor's required report for the assessment.

81.     The Audit Committee Charter provides, as to duties "Relating to the Internal Audit Function," that, "[t]he Committee shall establish, or determine that there have been established, guidelines and procedures or the maintenance of an internal audit function and shall assist with Board oversight of the internal audit function."

82.     The Audit Committee Charter provides, as to duties "Relating to Other Matters," that, "[t]he Committee shall regularly discuss the type of information to be disclosed and types of presentations to be made in connection with the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies."  Further, "[w]ith respect to any reference in [the] Charter to the NYSE or Commission requirements, the Committee shall be required to comply with these requirements when the Company is subject to the requirements of the NYSE or the [SEC]."

83.     Pursuant to their responsibilities as outlined in the Audit Committee Charter, the members of Tempur Sealy's Audit Committee were or should have been aware of the Individual Defendants' misconduct as alleged herein, especially the dissemination of false and misleading statements.  Their failure of oversight was in violation of the Audit Committee Charter.

<strong><u>INDIVIDUAL DEFENDANTS' MISCONDUCT</u></strong>

**<u>Background</u>**

84.     Tempur Sealy is the world's largest bedding manufacturer.  The Company develops, manufactures, and distributes bedding products that are sold worldwide in approximately 100 countries.  The Company has several product lines ranging from value to luxury, with brand names including TEMPUR®, Tempur-Pedic®, Stearns & Foster®, Sealy®, and Sealy Posturepedic®.

85.     Mattress Firm was Tempur Sealy's largest customer prior to and during a significant portion of the Relevant Period, and accounted for approximately 25% and 21% of the Company's overall net sales for 2015 and 2016, respectively.  Mattress Firm was included by Tempur Sealy as one of its "national accounts."

86.     On August 7, 2016, Steinhoff agreed to acquire Mattress Firm for approximately $2.4 billion, with the acquisition becoming effective on September 16, 2016.  Mattress Firm's business was disrupted in connection with the acquisition, due in part to its rebranding and merchandising of 1,000 of its Sleepy stores.

87.     After Mattress Firm's acquisition was announced, Mattress Firm pursued renegotiations of its supply agreements with Tempur Sealy.  Mattress Firm sought "significant economic concessions" from Tempur Sealy, among other things.  The Company and Mattress Firm were unable to resolve the matter, and ultimately Tempur Sealy issued formal termination notices, effective January 27, 2017, to Mattress Firm, for all of its brands.  Additionally, the Company announced that it would cease doing business with Mattress Firm in the first fiscal quarter of 2017.

88.     While the Company and Mattress Firm were engaging in the above-referenced renegotiations, the Individual Defendants made and/or caused the Company to make materially false and misleading statements and/or omissions of material fact with regard to Tempur Sealy's business, operations, and prospects, including those with Mattress Firm.

89.     On March 30, 2017, Mattress Firm filed a lawsuit in the District Court of Harris County, Texas against Tempur-Pedic and Sealy Mattress (two wholly-owned subsidiaries of Tempur Sealy), alleging breach of contract and tortious interference and seeking a declaratory judgment with respect to the interpretation of its agreements with the Company.

**False and Misleading Statements**

**July 28, 2016 Press Release**

90.     On July 28, 2016, the Company issued a press release where it announced its financial results for the second fiscal quarter 2016 ended June 30, 2016 (the "7/28/16 Press Release").  In the 7/28/16 Press Release, the Company failed to disclose that: (1) Mattress Firm

had been engaged in active negotiations to be acquired, and its acquisition was reasonably likely to have a material adverse effect on Tempur Sealy's operating results for the third and fourth fiscal quarters of 2016; (2) Tempur Sealy had engaged in active discussions with Mattress Firm with regard to modifications to the long-term supply agreements between them; (3) Mattress Firm sought significant economic concessions from the Company; (4) the Company lacked a reasonable basis for the positive statements it made about its business, operations, and prospects, particularly those related to Mattress Firm; and (5) the Company failed to maintain effective internal controls.

91.    Instead, the 7/28/16 Press Release provided a positive portrayal of the business, operations, and prospects of the Company that was false and misleading in light of the omissions of material adverse facts referenced above, which were known to the Individual Defendants.  In the 7/28/16 Press Release, Defendant Thompson commented positively on Tempur Sealy's results for the quarter, stating, in relevant part:

> Thanks to the hard work of our more than 7,000 associates worldwide, the Company had an excellent quarter. We are gaining traction toward the goals we have set.  Adjusted EBITDA and gross margins have increased for the third consecutive quarter, adjusted EPS is up 74%. We are improving operating leverage, continuing to invest heavily in our brands, expanding distribution, and successfully servicing our retailers and direct customers. By continuing to strengthen our iconic brands, drive higher ROIC and enhance our competitive cost position, we are positioning the Company well to deliver for our investors and other stakeholders for years to come.

92.    Moreover, the 7/28/16 Press Release noted that Tempur Sealy had updated its financial guidance and raised the low-end of its adjusted earnings before interest, tax, depreciation and amortization ("EBITDA") guidance for 2016, stating, in relevant part:

> The Company also today updated its financial guidance for 2016.  For the full year 2016, the Company currently expects Adjusted EBITDA[ ] to range from $525 million to $550 million. The Company noted its expectations are based on information available at the time of this release, and are subject to changing conditions, many of which are outside the Company's control.

**July 28, 2016 Conference Call**

93.     On July 28, 2016, the Company held an earnings conference call for second fiscal quarter 2016 (the "2Q 2016 Conference Call").  In the 2Q 2016 Conference Call, the Company failed to use this opportunity to disclose that: (1) Mattress Firm had been engaged in active negotiations to be acquired, and its acquisition was reasonably likely to have a material adverse effect on Tempur Sealy's operating results for the third and fourth fiscal quarters of 2016; (2) Tempur Sealy had engaged in active discussions with Mattress Firm with regard to modifications to the long-term supply agreements between them; (3) Mattress Firm sought significant economic concessions from the Company; (4) the Company lacked a reasonable basis for the positive statements it made about its business, operations, and prospects, particularly those related to Mattress Firm; and (5) the Company failed to maintain effective internal controls.

94.     Instead, the 2Q 2016 Conference Call provided a positive portrayal of the business, operations, and prospects of the Company that was false and misleading in light of the omissions of material adverse facts referenced above, which were known to the Individual Defendants. During the 2Q 2016 Conference Call, Defendant Hytinen commented positively on the Company's performance in its North America segment, and stated, in relevant part:

> Net sales for the second quarter were $804 million, up 5.2% versus the second quarter last year and on a constant currency basis, they were up 6.6%. Adjusted gross margin improved 250 basis points to 41.9% and adjusted operating margin improved 340 basis points to 12.6%. On a segment basis, North America net sales increased 6% and were up 6.4% in constant currency. Both the Tempur and Sealy U.S. businesses grew mid-single-digits. Sales in Canada's were strong, increasing 15% on a constant currency basis and high single-digits at reported rates.
>
> North America bedding products sales increased 5.2% and 6% at constant currency. Bedding units were up 2% in total. However, excluding floor models, they were up 3% as our launches last year had more floor model units. Sales growth was driven by higher demand for our Tempur products, particularly our new Breeze mattresses. Our Sealy Posturepedic and new Stearns & Foster products were also key drivers

of growth. National accounts were below fleet performance. While that was a headwind to our revenue, it was a tailwind to our gross margin.

Year-over-year average selling price was positively impacted by pricing actions taken earlier this year and positive merchandising mix for both Tempur-Pedic and our Sealy brand products. Our North American other channel grew 70% in the quarter. This channel is predominantly made up of our hospitality and high-margin Tempur direct-to-consumer business. As I look at our results, a personal highlight for me is that our internet sales increased over 40% as compared to the second quarter last year. Other product sales were up 25%, primarily driven by our joint venture, and offset by lower sales of Tempur-Pedic pillows. The decline in pillows sales is an area that the team is looking at very closely and may have some upside in 2017.

95.     Defendant Hytinen also discussed the Company's 2016 financial guidance, and referenced anticipated "headwinds." Hytinen, however, only attributed them to the upcoming U.S election cycle, international events and some "unfavorable FX," and failed to disclose the potential "headwinds" that could arise as a result of the Company's ongoing dealings with Mattress Firm. He stated, in relevant part:

Now, turning to our financial guidance, today we are raising the low-end of our adjusted EBITDA guidance from $500 million to $525 million, and maintaining the high end at $550 million. The midpoint of the new range of EBITDA guidance, which increased from $525 million to $538 million, represents an increase of $82 million or 18% versus prior year. We expect to experience some sales headwinds from a noisy U.S. election cycle, continued uncontrollable events internationally, and some unfavorable FX. This combined with our first half sales performance of 1.4% net sales growth, we anticipate low single-digit growth for the full year.

96.     Also during the 2Q 2016 Conference Call, Defendant Thompson had an exchange with an analyst concerning areas of weakness, including the Company's national accounts. During the exchange, Defendant Thompson stated that he "wouldn't say there is any new developments that caused [sic] me to be concerned," failing to disclose the issues concerning Mattress Firm, which was one of Tempur Sealy's largest national accounts. The exchange, in relevant part, was as follows:

[Analyst]

30

He, guys.  Great quarter.  Scott, you called out three items of areas of weakness in the quarter, national accounts and Germany and pillows.  But Germany, I know, it's been under pressure for a few years and national accounts at least for the second quarter in a row.  Is there any new developments there that cause you to be concerned?

[Defendant Thompson]

No, I wouldn't say there is any new developments that caused me to be concerned. I think what I was pointing out is sometimes you report a quarter and you look at it and you say, gee's we hit on all eight cylinders, and we're peak earnings or something. I think what I wanted to make sure I pointed out clearly on the call, is there are some pretty major buckets that are within the company that are still underperforming. Now we've got action plans around those items and we are optimistic that in 2017 we'll begin to have good news. But there's nothing new that I would say in those particular buckets. You're right, they been underperforming for a few quarters.

97.     Defendant Thompson also had an additional exchange with an analyst where he was asked for insight on areas of weakness, and Thompson noted that he believed business from the Company's national accounts, which include Mattress Firm, would be "fruitful."  The exchange, in relevant part, was as follows:

[Analyst]

Thanks a lot and good morning. Can you give us a little more insight on to Sealy North American revenue growth breakdown between prices versus units? And as a follow-up to that, if you talk about some of the areas of weakness and what you are doing to address those.

* * *

[Defendant Thompson]

Yes. And I think you asked to expand on the areas that were underperforming and some actions around them. The three I called out were national accounts, Germany and pillows. If you look at national accounts, we're working with each of the national accounts, the sales teams, working with them individually. And I think that's going to be fruitful.

98.     During the 2Q 2016 Conference Call, Defendant Thompson also was asked to provide more information regarding the Company's financial outlook, and stated that "it feels

pretty good" for the remainder of 2016 in North America, with the concerns only about the Olympics and the U.S. presidential election. Thompson failed to disclose the Company's issues involving Mattress Firm as a potential concern. The exchange, in relevant part, was as follows:

> [Analyst]
>
> Thanks. Good morning, Scott and Barry. And let me add my congratulations, as well, on a great quarter here. I wanted to ask about the outlook for North America revenue in the second half of the year. And if you could just give us a little bit more color on your underlying assumptions for the outlook. And then just a quick follow-up on that strong internet performance, maybe anything that you think may be driving that or new steps or initiatives that you have in place to take advantage of opportunities in that channel. Thank you.
>
> [Defendant Thompson]
>
> Sure. Let me take a stab at it and then Barry will fix it after I talk. When we talk about detailed revenue forecast for the back half of the year, probably not going to go too granular on that. I would tell you that North America feels pretty good. It doesn't feel great. As I've talked about it over the last really six months it's really the same story. It feels good, then it feels weak, then it feels good, then it feels weak. I think that's just the reflection of a sputtering economy that may have a GDP of 1.5% to 2%, so as we continue to expect.
>
> We do feel, we may be a little conservative. We are nervous, I guess is the word, about what we think is going to be a noisy election cycle in North America and with the Olympics. And it's been, at least my experience, that kind of noise can crowd out your message. So that's a call out. That's really the only thing we're seeing in North America that I would say we are concerned about.

**August 5, 2016 Form 10-Q**

99.     On August 5, 2016, the Company filed a quarterly report on Form 10-Q with the SEC (the "2Q 2016 10-Q"), signed by Defendant Hytinen, which reiterated the financial results for the second fiscal quarter ended June 30, 2016 and previously announced in the 7/28/16 Press Release. The 2Q 2016 10-Q failed to disclose that: (1) Mattress Firm had been engaged in active negotiations to be acquired, and its acquisition was reasonably likely to have a material adverse effect on Tempur Sealy's operating results for the third and fourth fiscal quarters of 2016; (2) Tempur Sealy had engaged in active discussions with Mattress Firm with regard to modifications

to the long-term supply agreements between them; (3) Mattress Firm sought significant economic concessions from the Company; (4) the Company lacked a reasonable basis for the positive statements it made about its business, operations, and prospects, particularly those related to Mattress Firm; and (5) the Company failed to maintain effective internal controls.

100.    Pursuant to Item 303 of Regulation S-K,[3] the Company provided an item in the 2Q 2016 10-Q titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" (the "DAFC").    The SEC has provided interpretive guidance[4] related to the requirements of Item 303 of Regulation S-K concerning the disclosure of material events and uncertainties, which states, in relevant part:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

> * * *

> Events that have already occurred or are anticipated often give rise to known uncertainties. For example, a registrant may know that a material government contract is about to expire. The registrant may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed. More particularly, the registrant may know that a competitor has found a way to provide the same service or product at a price less than that charged by the registrant, or may have been advised by the government that the contract may not be renewed. The registrant also would have factual information relevant to the financial impact of non-renewal upon the registrant. In situations such as these, a registrant would have identified a known uncertainty reasonably likely to have material future effects on its financial condition or results of operations, and disclosure would be required.

101.    The DFAC, in violation of the disclosure requirements of Item 303 of Regulation S-K, failed to disclose "known uncertainties" and material events that were "reasonably likely to

---

[3] 17 C.F.R. §229.303
[4] *SEC Interpretation: Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures*, which can be accessed here: https://www.sec.gov/rules/interp/33-6835.htm

have material future effects on its financial condition or results of operations"—namely, those related to Mattress Firm.

102.    Moreover, the 2Q 2016 10-Q represented that the Company's disclosure controls and procedures were effective, which was false and misleading in light of the Individual Defendants' and Company's false and misleading statements and omissions of material fact.  The 2Q 2016 10-Q stated, in relevant part:

> An evaluation was performed under the supervision and with the participation of our management, including our Chief Executive Officer (principal executive officer) and Chief Financial Officer (principal financial officer), of the effectiveness of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended ("Exchange Act"), as of the end of the period covered by this report. Based on that evaluation, our management, including our Chief Executive Officer and Chief Financial Officer, concluded that our disclosure controls and procedures were effective as of June 30, 2016 and designed to ensure that information required to be disclosed by us in reports that we file or submit under the Exchange Act, is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's ("SEC") rules and forms and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

103.    Attached to the 2Q 2016 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) of the Exchange Act, Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX"), and 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sox, ("SOX Certifications"), signed by Defendants Thompson and Hytinen, attesting to the accuracy of the 2Q 2016 10-Q.

**September 14, 2016 Registration Statement**

104.    On September 14, 2016, the SEC declared effective the Company's Form S-4 registration statement which offered to exchange $600 million of 5.500% Senior Notes due 2026 for new 5.500% Senior Notes due 2026.  The registration statement incorporated by reference the information contained in the 2Q 2016 10-Q, including the materially false and misleading

statements made therein.  Thus, the registration statement was also materially false and misleading in the same manner as the 2Q 2016 10-Q.

### September 27, 2016 Press Release

105.    On September 27, 2016, the Company issued a press release (the "9/27/16 Press Release") providing an update to its financial guidance for the full year 2016, and announcing that its third fiscal quarter 2016 net sales were below the Company's prior expectations.  The 9/27/16 Press Release further stated that the Company "expect[ed] net sales for the full year to be down 1 to 3 percent as compared to 2015."   The 9/27/16 Press Release failed to disclose that: (1) Steinhoff's acquisition of Mattress Firm was reasonably likely to have a material adverse effect on Tempur Sealy's operating results for the third and fourth fiscal quarters of 2016; (2) Tempur Sealy had engaged in active discussions with Mattress Firm with regard to modifications to the long-term supply agreements between them; (3) Mattress Firm sought significant economic concessions from the Company; (4) the Company lacked a reasonable basis for the positive statements it made about its business, operations, and prospects, particularly those related to Mattress Firm; and (5) the Company failed to maintain effective internal controls.

106.    Instead, the 9/27/16 Press Release provided a positive portrayal of the business, operations, and prospects of the Company that was false and misleading in light of the omissions of material adverse facts referenced above, which were known to the Individual Defendants.  In the 9/27/87 Press Release, Defendant Thompson commented on the reduction in Tempur Sealy's 2016 guidance, but failed to disclose the current or potential impact of its dealings with Mattress Firm:

> Third quarter net sales are below our prior expectations. We currently expect net sales for the full year to be down 1 to 3 percent as compared to 2015. For the full year 2016, the Company currently expects Adjusted EBITDA to range from $500 million to $525 million.

. . . While our net sales are below expectations, our operational initiatives are going well and are continuing to drive considerable margin expansion.  The net impact of the revenue shortfall and our continued margin expansion is that we felt it was appropriate to lower the midpoint of our adjusted EBITDA guidance by 5%. The midpoint of this updated guidance implies an increase in adjusted EBITDA of approximately 12% and approximately 20% growth in adjusted earnings per share compared to 2015.

**September 27, 2016 Deutsche Bank Conference**

107.    Also on September 27, 2016, the Company made a presentation at the Deutsche Bank Leveraged Finance Conference, where Defendant Thompson further commented on the Company's reduction in guidance for 2016, but again failed to disclose that: (1) Steinhoff's acquisition of Mattress Firm was reasonably likely to have a material adverse effect on Tempur Sealy's operating results for the third and fourth fiscal quarters of 2016; (2) Tempur Sealy had engaged in active discussions with Mattress Firm with regard to modifications to the long-term supply agreements between them; (3) Mattress Firm sought significant economic concessions from the Company; (4) the Company lacked a reasonable basis for the positive statements it made about its business, operations, and prospects, particularly those related to Mattress Firm; and (5) the Company failed to maintain effective internal controls.

108.    Thompson attributed the reduction primarily to: (1) management reducing Tempur Sealy's promotional days mistakenly during the third quarter; (2) a softness in demand industry-wide; (3) management focusing its advertising efforts on its newly launched product TEMPUR-Breeze at the expense of the other products in its Tempur Pedic product line; and (4) the acquisition of Mattress Firm by Steinhoff, which caused "transitions" in its business.  However, he failed to provide the public with a complete picture that took into account the omissions of material fact as referenced herein.

109.    As part of prepared remarks, Defendant Thompson addressed Steinhoff's acquisition of Mattress Firm and noted that Mattress Firm was working through a rebranding of some of its stores, and that Tempur Sealy was "very optimistic long term."  This comment particularly lacked a reasonable basis and was false and misleading in light of the considerable modifications and significant economic concessions that Mattress Firm was asking for in its renegotiations with the Company.  Defendant Thompson stated, in relevant part:

> our largest client, our largest customer, recently got purchased. They are going through some transitions and we are feeling some of that transition. We are very optimistic long term, but as they work through rebranding some of their stores, we are going to feel some of that.

110.    During the conference, Defendant Thompson also noted that Mattress Firm's rebranding effort included re-flooring its Sleepy stores and that issues related to Mattress Firm would normalize and were transitory in nature, commenting that "within a quarter or two, we'll be back on what I'll call a normal basis."  Thompson further noted that the Company was "thrilled with the changes [Mattress Firm was] making."  These comments also lacked a reasonable basis and were false and misleading based on the material adverse facts referenced herein that the Individual Defendants failed to disclose, including Mattress Firm's requests for significant economic concessions.  Defendant Thompson stated, in relevant part:

> The question, in case -- you are not mic'd up. The question is the transition, as it relates to our largest customer [Mattress Firm], what type of transition is it?
>
> First off, I'm going to be a little bit careful because we don't generally talk about individual customers. But as you'll see in the 10-K, they are 25% of our business, so you're going to see activity in that footnote anyway. So I think I can speak and should speak a little bit about it.
>
> I would say that, look, first of all, we are thrilled with the changes they are making. We are thrilled with their new ownership and we think that they'll be very successful long term. But as you may or may not know, they are also rebranding quite a few stores and transitioning from the Sleepy's brand to the Mattress Firm brand. That means a lot of stuff moving around, and they're going to have to work

through that. And while they are working through that, we are going to feel some of that, but I think they'll get through that very rapidly. And within a quarter or two, we'll be back on what I'll call a normal basis.

Also, we thought originally that the Stearns & Foster product would make it onto Matt Firm's floor in the third quarter. As I told you before, Stearns & Foster is doing very well. And we just couldn't fit the production into our factories in a way that made sense for us and made sense for them as they re-floored. And so we had to push some of that off a month or so into the fourth quarter. So I'm going to say most of that is on us, but it's -- that was a disappointment.

111.    On this news, the price per share of Tempur Sealy stock fell $16.68 per share, or over 22%, from its previous day closing price to close at $57.77 on September 28, 2016.

**October 27, 2016 Press Release**

112.    On October 27, 2016, the Company issued a press release announcing financial results for the third fiscal quarter 2016 ended September 30, 2016 (the "10/27/16 Press Release"). The 10/27/16 Press Release reported that in the third quarter of 2016, the Company's net sales had decreased by 5.4% compared to the same fiscal quarter in 2015.  Additionally, the 10/27/16 Press Release stated that total net sales decreased by 4.6% on a constant currency basis, with a net sales decrease of 5.8% in its North America segment and 1.8% in its International segment.  The 10/27/16 Press Release failed to disclose that: (1) Steinhoff's acquisition of Mattress Firm was reasonably likely to have a material adverse effect on Tempur Sealy's operating results for the third and fourth fiscal quarters of 2016; (2) Tempur Sealy had engaged in active discussions with Mattress Firm with regard to modifications to the long-term supply agreements between them; (3) Mattress Firm sought significant economic concessions from the Company; (4) the Company lacked a reasonable basis for the positive statements it made about its business, operations, and prospects, particularly those related to Mattress Firm; and (5) the Company failed to maintain effective internal controls.

113.    Instead, the 10/27/16 Press Release provided a positive portrayal of the business, operations, and prospects of the Company that was false and misleading in light of the omissions of material adverse facts referenced above, which were known to the Individual Defendants. Indeed, Defendant Thompson focused on certain positive results, including the Company's reported EBITDA and U.S. generally accepted accounting principles ("GAAP") earnings per diluted share ("EPS") figures, stating:

> We are pleased to report record EBITDA and GAAP EPS for the quarter. The flexibility of our business model was displayed this quarter as our top line sales were below our original expectations yet we delivered significant margin expansion and 19% EPS growth. We continue to effectively execute on our core strategy to drive our long term operating performance.

**October 27, 2016 Conference Call**

114.    Also on October 27, 2016, the Company held an earnings conference call discussing its third fiscal quarter 2016 financial results (the "10/27/16 Conference Call") and the Company's sales shortfall.  The 10/27/16 Conference Call failed to disclose that: (1) Steinhoff's acquisition of Mattress Firm was reasonably likely to have a material adverse effect on Tempur Sealy's operating results for the third and fourth fiscal quarters of 2016; (2) Tempur Sealy had engaged in active discussions with Mattress Firm with regard to modifications to the long-term supply agreements between them; (3) Mattress Firm sought significant economic concessions from the Company; (4) the Company lacked a reasonable basis for the positive statements it made about its business, operations, and prospects, particularly those related to Mattress Firm; and (5) the Company failed to maintain effective internal controls.

115.    Instead, the 10/27/16 Conference Call provided a positive portrayal of the business, operations, and prospects of the Company that was false and misleading in light of the omissions of material adverse facts referenced above, which were known to the Individual Defendants.

Defendant Thompson stated in the conference call that the less than expected reported sales for the Company was an "air pocket," and the "sales shortfall was largely due to 5.8% decline in the North America segment."  Thompson stated, in relevant part:

> Now I'd like to call out few specific items in the quarter. The third quarter sales were down 4.6% year-on-year on a constant currency basis versus the third quarter last year. This was below our expectations. The sales shortfall was largely due to 5.8% decline in the North America segment.
>
> I'd like to take a minute and talk about the factors impacting our topline results in North America.

116.    Defendant Thompson attributed the shortfall in sales in the third quarter generally to: (1) management reducing Tempur Sealy's promotional days during the Labor Day period mistakenly; (2) a softness in demand industry-wide; (3) management overemphasizing its advertising efforts on its newly launched TEMPUR-Breeze line at the expense of its legacy Tempur products; (4) a decline in non-bedding product sales; and (5) the remerchandising and rebranding of over 1,000 Mattress Firm stores.

117.    In a further effort to present a positive portrayal of the Company and deflect from issues with Mattress Firm, Defendant Thompson noted that the Company's U.S. sales during the third quarter of 2016 would have been flat on a year-over-year basis but for a decline related to Mattress Firm, which would suggest that sales to Mattress Firm declined approximately $40-50 million during the quarter.  Although Thompson notably commented that Mattress Firm's remerchandising and rebranding efforts were expected to adversely impact the Company's U.S. sales for the remainder of 2016, he did not indicate that the impact would be material and stated that he expected sales to improve in 2017.  The statement that the Company's sales to Mattress Firm would improve during 2017 particularly lacked a reasonable basis and was false and misleading in light of the considerable modifications and significant economic concessions that

Mattress Firm was asking for in its renegotiations with the Company.  Defendant Thompson stated,

in relevant part:

> We believe this air pocket in sales during the third quarter was driven largely of the following.
>
> First, it is clear the retail environment in the U.S. in the third quarter was less robust than we had expected. Based on our review of industry data and conversations with industry participants, overall mattress sales in the U.S. were soft during the third quarter.
>
> In addition, to softness is not limited to the mattress industry, as we've seen similar challenging resulting furniture, home appliances, auto retail, and other consumer durable goods.
>
> Second, we experienced some significant weakness in our largest national account which is in the process of re-branding entry merchandising over 1,000 recently acquired stores. To put this factor in perspective, if we were to exclude the sales of our largest national account in the third quarter of 2016 and 2015, our U.S. sales would have been flat for the third quarter.
>
> We expect this transition of stores to be very successful, but we also expect it will continue to impact our sales for the remainder of 2016 before improving in 2017. We are encouraged by the improved Tempur Sealy sales trends in the markets that have already undergone re-branding and arterial to help we can any significant transition.
>
> Third, we made a couple of mistakes in our marketing and sales strategy. For example, our advertising campaign overemphasized our newly launched Tempur breeze line and neglected to support legacy Tempur products. This resulted in very strong performance from our Tempur breeze line of products but declines in our legacy products as they were not included in the advertising.
>
> Another example of a misstep was our reduction in the number of promotional days around the key Labor Day period compared to last year. This point is at a disadvantage on the retail floor. I should also point out that we redesigned our Tempur leverage an incentive, adding unnecessary complexity.
>
> Lastly, [our non-bedding] product sales for pillows and products sold through North American joint venture were down $20 million, representing almost half of our North American revenue decline this quarter. We had mentioned previously that are pillow business needs some attention and we plan to update you on our plans next quarter.

118.    The 10/27/16 Conference Call included a question and answer portion where Defendant Thompson was asked about the medium-term outlook and long-term opportunities related to Mattress Firm.  In response, Thompson stated that the Company's "sales have increased from a balance of share standpoint," and that Tempur Sealy found Steinhoff to be "outstanding." The statement regarding Steinhoff was particularly false and misleading in light of the considerable modifications and significant economic concessions that Mattress Firm was asking for in its contentious renegotiations with the Company.  The exchange was as follows:

[Analyst]

Yes, thank you for taking my question. My first question will be on distribution in really two parts. I was hoping you could talk a little bit more about transition, re-branding that's underway at mattress firm and maybe give a little more color around how much of an issue may be at the sleepy's stores that are being re-branded and how much floor base is changing are you gaining shares as they re-brand the stores maybe what that the immediate term outlook is there? And then part two would be kind of longer-term, how you think of the opportunity with Mattress Firm, particularly as they are now under new ownership.

[Defendant Thompson]

First of all, let me say that I would normally never even talk about an individual customer on the phone but the FCC requires us to have some financial disclosure of that concentration so it's impossible not to. You will see some of that disclosure in the Q that we will be filing.

I think the first thing I would say is, we think it will be very successful, the transition of the stores. It's a fluid process. We're not going to talk about their game plan because that's confidential, but I can tell you where they have made the transition in rebranding.

The stores have done well. And Tempur Sealy's sales have increased from a balance of share stand point. I think I can say that clearly. As far as new ownership, look, we work with the Steinhoff Organization worldwide, in general we find them to be outstanding. And our balance of share has increased generally worldwide in markets that we have worked with them.

And we are wildly optimistic about the future for both the Mattress Firm team and Tempur Sealy.

119.    Also during the 10/27/16 Conference Call, Defendant Thompson commented, "we are working closely with our largest accounts and will continue to work very closely with them and make the investments we need to in people and energy to make that transition successful." This statement failed to provide a complete picture of the obstacles to making such a transition successful, including the Company's renegotiations with Mattress Firm, and was thus false and misleading.

**November 4, 2016 Form 10-Q**

120.    On November 4, 2016, the Company filed a Form 10-Q with the SEC for the third fiscal quarter 2016 (the "3Q 2016 10-Q"), signed by Defendant Hytinen, and which contained substantially the same financial results contained in the 10/27/16 Press Release.  The 3Q 2016 10-Q failed to disclose that: (1) Steinhoff's acquisition of Mattress Firm was reasonably likely to have a material adverse effect on Tempur Sealy's operating results for the third and fourth fiscal quarters of 2016; (2) Tempur Sealy had engaged in active discussions with Mattress Firm with regard to modifications to the long-term supply agreements between them; (3) Mattress Firm sought significant economic concessions from the Company; (4) the Company lacked a reasonable basis for the positive statements it made about its business, operations, and prospects, particularly those related to Mattress Firm; and (5) the Company failed to maintain effective internal controls.

121.    The 3Q 2016 10-Q contained the same false and misleading DFAC disclosures and internal control representations made in the 2Q 2016 10-Q.  Additionally, attached to the 3Q 2016 10-Q were SOX Certifications signed by Defendants Thompson and Hytinen, attesting to the accuracy of the 3Q 2016 10-Q

**The Truth Emerges**

**January 30, 2017 Press Release**

122.   On January 30, 2017, prior to the market opening, Tempur Sealy issued a press release (the "1/30/17 Press Release") announcing that representatives of Steinhoff and the senior management of Mattress Firm had notified the Company of their intent to terminate all U.S. contracts with Tempur Sealy if the Company did not agree to "significant economic concessions" and further considerable modifications to the existing agreements between Mattress Firm and Tempur Sealy.  Moreover, the 1/30/17 Press Release stated that after a resolution of the matter was not able to be reached by the parties, Tempur Sealy issued formal termination notices, effective January 27, 2017, to Mattress Firm for all of Tempur Sealy's brands, and that the Company expected to end business with Mattress Firm in the first fiscal quarter 2017.  The 1/30/17 Press Release stated, in relevant part:

> Tempur Sealy International, Inc. (NYSE: TPX, the "Company") announced that during the week of January 23, 2017, senior management of Mattress Firm Holdings Corp. ("Mattress Firm") and representatives of its parent Steinhoff International Holdings N.V. ("Steinhoff"), verbally notified the Company of its intent to terminate all of their contracts with the Company in the United States, if the Company did not agree to considerable changes to their agreements, including significant economic concessions. The Company engaged in discussions to facilitate a mutually agreeable supply arrangement with Mattress Firm. However, the parties were unable to reach an agreement, and the Company issued formal termination notices for all of the Company's brands to Mattress Firm as of January 27, 2017. The Company anticipates it will cease doing business with Mattress Firm during the first quarter of 2017.

123.   On this news, the price per share of Tempur Sealy stock fell $17.70, or over 28%, from its closing price on the previous day the market was open, to close at $45.49, on January 30, 2017.

124.   The statements referenced in paragraphs 91-92, 94-106, 108-10, 112-13, and 115-21 above were materially false and misleading because they misrepresented and failed to disclose material adverse facts pertaining to the Company's business, operations, and prospects, which were known to the Individual Defendants or recklessly disregarded by them.  Specifically, the

Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) Mattress Firm had been engaged in active negotiations to be acquired, and its acquisition was reasonably likely to have a material adverse effect on Tempur Sealy's operating results for the third and fourth fiscal quarters of 2016; (2) Tempur Sealy had engaged in active discussions with Mattress Firm with regard to modifications to the long-term supply agreements between them; (3) Mattress Firm sought significant economic concessions from the Company; (4) the Company lacked a reasonable basis for the positive statements it made about its business, operations, and prospects, particularly those related to Mattress Firm; and (5) the Company failed to maintain effective internal controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

125.    The Individual Defendants breached their fiduciary duties by making and/or causing the Company to make the foregoing material misrepresentations and omissions. Moreover, the Individual Defendants failed to correct and/or caused the Company to fail to correct these false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.  Additionally, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

## REPURCHASES

126.    During the Relevant Period, but before the truth came out, the Company repurchased at least 3.5 million shares of its common stock.  On January 30, 2017, the day the 1/30/17 Press Release was issued, the price per share of Company stock fell to $45.49 at the close of market.  This reflected the true price per share of Tempur Sealy common stock, had the

Individual Defendants not engaged in their schemes as outlined herein.  Therefore, any repurchases by the Company should have been made valuing their common stock at no more than $45.49.

127.    During the three months ended December 31, 2016, the Individual Defendants caused the Company to repurchase 3.5 million shares of its own common stock at an average price per share of approximately $61.51, for a total cost to the Company of approximately $215.3 million.

128.    Due to the artificial inflation of the Company's stock price caused by the misrepresentations alleged to have been made during the Relevant Period, which benefitted one of the Individual Defendants who engaged in insider sales of Company stock, the Company paid on average at least $16.02 more than each such share was worth at the time it was repurchased by the Company.  Thus, the total over payment by the Company for its repurchases of its own stock during the three months ended December 31, 2016 was over $56 million.

### DAMAGES TO TEMPUR SEALY

129.    As a direct and proximate result of the Individual Defendants' conduct, Tempur Sealy will lose and expend many millions of dollars.

130.    Such expenditures include, but are not limited to, legal fees associated with defending the Federal Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto, and losses of revenues caused by customers' loss of trust in the Company's business and products.

131.    Such costs include, but are not limited to, compensation, bonuses tied to the Company's attainment of certain goals, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

132.    Such losses include, but are not limited to, over $56 million dollars lost due to over payment for repurchases of the Company's own common stock.

133.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

134.    As a direct and proximate result of the Individual Defendants' conduct, Tempur Sealy has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's business and stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

135.    Plaintiff brings this action derivatively and for the benefit of Tempur Sealy to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Tempur Sealy, gross mismanagement, abuse of control, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof.

136.    Tempur Sealy is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

137.    Plaintiff is, and has been at all relevant times, a shareholder of Tempur Sealy. Plaintiff will adequately and fairly represent the interests of Tempur Sealy in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

138.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

139.    A pre-suit demand on the Board of Tempur Sealy is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven directors: Defendants Thompson, Dilsaver, Heil, Luther, Nabi, Neu, and Trussell (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors who are on the Board at the time this action is commenced.

140.    Moreover, demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their scheme and the false and misleading statements and omissions of material facts described herein, while they caused the Company to repurchase its own stock at artificially inflated prices and one of them engaged in insider sales of Company stock based on material non-public information, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

141.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein.  The fraudulent scheme was intended to make the Company appear more stable, profitable, and attractive to investors.  While investors were duped into believing the fraud perpetrated by the Individual Defendants, the Company repurchased its own stock and one of the Individual Defendants sold hundreds of thousands of dollars' worth of Company stock at artificially inflated prices based on material inside information.  As a result of

48

the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

142.    Furthermore, demand in this case is excused because the Directors, who are named as defendants in this action, control the Company and are beholden to each other. Thus, each member of the Board is not disinterested or independent, faces a substantial likelihood of liability, and, thus, demand on each Director would have been futile, and is thus excused.

143.    Additional reasons that demand on Defendant Thompson is futile follow. Defendant Thompson has served as the Company's CEO, President, and Chair of the Board since September 2015. He received lavish compensation, including $6,237,174 in 2016. Thus, as the Company admits, Thompson is a non-independent director. Defendant Thompson was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the Company's conference calls, press releases, and SEC filings outlined herein (he personally made statements in the conference calls and press releases). Defendant Thompson's large Company stock holding, worth over $4.10 million on March 9, 2016, reveals his interest in keeping the Company's stock price as high as possible. Moreover, Defendant Thompson is a defendant in the Federal Securities Class Action. As Chairman of the Board, CEO, and President, Defendant Thompson conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also approved the Company's overpaying more than $56 million during the Relevant Period for repurchases of its own common stock. Thus, for these reasons, too, Defendant Thompson breached his fiduciary duties, faces a substantial likelihood of

liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

144.    Additional reasons that demand on Defendant Dilsaver is futile follow.  Defendant Dilsaver has served as a Company director since December 2009.  She also serves as Chair of the Audit Committee and as a member of the Nominating and Corporate Governance Committee.  Defendant Dilsaver received lavish compensation, including $230,156 in 2016.   Her large Company stock holding, worth over $1.76 million on March 9, 2016, reveals her interest in keeping the Company's stock price as high as possible.  As a long-time director and Chair of the Audit Committee, Defendant Dilsaver conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.  She also approved the Company's overpaying more than $56 million during the Relevant Period for repurchases of its own common stock.  Thus, for these reasons, too, Defendant Dilsaver breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

145.    Additional reasons that demand on Defendant Heil is futile follow.  Defendant Heil has served as a Company director since March 2008.  He also serves as Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee.  Defendant Heil received lavish compensation, including $218,601 in 2016.  His large Company stock holding, worth over $1.76 million on March 9, 2016, reveals his interest in keeping the Company's stock price as high as possible.  As a long-time director and member of the Audit Committee, Defendant Heil conducted little, if any, oversight of the Company's engagement in the scheme to make false

and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also approved the Company's overpaying more than $56 million during the Relevant Period for repurchases of its own common stock. Thus, for these reasons, too, Defendant Heil breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

146.     Additional reasons that demand on Defendant Luther is futile follow. Defendant Luther has served as a Company director since May 2015. He also serves as Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Luther received lavish compensation, including $208,601 in 2016. His large Company stock holding, worth over $459,085 on March 9, 2016, reveals his interest in keeping the Company's stock price as high as possible. As a Company director, Defendant Luther conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also approved the Company's overpaying more than $56 million during the Relevant Period for repurchases of its own common stock. Thus, for these reasons, too, Defendant Luther breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

147.     Additional reasons that demand on Defendant Nabi is futile follow. Defendant Nabi has served as a Company director since May 2015. He also serves as a member of the Compensation Committee and a member of the Nominating and Corporate Governance Committee. As a Senior Partner at Tempur Sealy's second largest stockholder, H Partners, who

was appointed to the Board pursuant to a deal between the Company and H Partners, Nabi is not an independent director and is unable to put the interests of the Company above his own. Moreover, as a Company director, Defendant Nabi conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  He also approved the Company's overpaying more than $56 million during the Relevant Period for repurchases of its own common stock.  Thus, for these reasons, too, Defendant Nabi breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

148.    Additional reasons that demand on Defendant Neu is futile follow.  Defendant Neu has served as a Company director since May 2015.  He also serves as Lead Director, as a member of the Audit Committee, and as a member of the Compensation Committee.  Defendant Neu received lavish compensation, including $237,736 in 2016.  His large Company stock holding, worth over $1.24 million on March 9, 2016, reveals his interest in keeping the Company's stock price as high as possible.  As the Company's Lead Director and member of the Audit Committee, Defendant Neu conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  He also approved the Company's overpaying more than $56 million during the Relevant Period for repurchases of its own common stock.  Thus, for these reasons, too, Defendant Neu breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

149.    Additional reasons that demand on Defendant Trussell is futile follow.  Defendant Trussell has served as a Company director since 2002.  Defendant Trussell received lavish compensation, including $202,156 in 2016.  His large Company stock holding, worth over $3.55 million on March 9, 2016, reveals his interest in keeping the Company's stock price as high as possible.  His insider transactions before the fraud was exposed, which yielded approximately $377,500 in proceeds, demonstrate his motive in facilitating and participating in the fraud.  As a long-time director, Defendant Trussell conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  He also approved the Company's overpaying more than $56 million during the Relevant Period for repurchases of its own common stock.  Thus, for these reasons, too, Defendant Trussell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

150.    Additional reasons that demand on the Board is futile follow.

151.    The Individual Defendants face a substantial likelihood of liability for the Company's repurchases of its own stock during the Relevant Period which resulted in an overpayment by the Company of more than $56 million.  The repurchases were made while the Company's stock price was artificially inflated due to the false and misleading statements alleged herein.  Thus, any demand on the Directors, including Defendant Trussell, who engaged in insider sales and benefitted especially from the artificial inflation, would be futile.

152.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best

interests of the Company and its shareholders.  These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.  Thus, any demand on the Directors would be futile.

153.    Each of the Directors is liable for engagement in the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarding their duties to monitor engagement in the scheme, and consciously disregarding their duties to protect corporate assets.  Thus, each of the Directors faces a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

154.    Defendants Dilsaver, Heil, and Neu failed to fulfill their duties pursuant to the Audit Committee Charter.  As members of Tempur Sealy's Audit Committee, they were or should have been aware of the Individual Defendants' misconduct as alleged herein, especially the dissemination of false and misleading statements.  Defendants Dilsaver, Heil, and Neu each face a substantial likelihood of liability for their failure of oversight in violation of the Audit Committee Charter.  Therefore, demand as to each of them would be futile, and is therefore excused.

155.    The Directors, as members of the Board, were and are subject to the Code of Ethics. The Code of Ethics goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations.  The Code of Ethics requires the Directors to also adhere to Tempur Sealy's standards of business conduct.  The Code of Ethics requires all employees, officers and directors to avoid activities that are unlawful or conflict with the Company's policies.  The Directors did not comply with the requirements of the Code of Ethics.  The Directors violated the Code of Ethics because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements and omissions alleged herein, failed to maintain adequate internal controls, and engaged in, or facilitated one of the Individual Defendants'

54

engagement in sales of Company stock on non-public material information.  Because the Directors violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

156.    The Directors, as members of the Board, were and are subject to the Governance Guidelines, which go well beyond the basic fiduciary duties required by applicable laws, rules, and regulations.  The Governance Guidelines require the Directors to exercise their business judgment to act in what they reasonably believe to be the best interests of the Company and its shareholders.  The Directors did not comply with the requirements of the Governance Guidelines. The Directors violated the Governance Guidelines because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements and omissions alleged herein, failed to maintain adequate internal controls, and engaged in, or facilitated other Individual Defendants engagement in sales of Company stock on non-public material information.  Such misconduct cannot reasonably be said to be in the best interest of the Company and its shareholders.  Because the Directors violated the Governance Guidelines, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

157.    Furthermore, demand in this case is excused because the Directors, who are named as defendants in this action, control the Company and are beholden to each other.  The Board is especially beholden to Defendant Nabi, who is a Senior Partner for H Partners, the Company's second largest shareholder, and may fear retaliation by Nabi if they grant a demand.  Indeed, H Partners has already previously caused the Company to change its Board composition.[5]

---

[5] *Tempur Sealy Settles With Hedge Fund H Partners After CEO Ouster*, FORBES (May 11, 2015), available at: https://www.forbes.com/sites/antoinegara/2015/05/11/tempur-sealy-settles-with-hedge-fund-h-partners-after-ceo-ouster/#b2bfd1b23e44.

158.    Tempur Sealy has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Tempur Sealy any part of the damages Tempur Sealy suffered and will continue to suffer thereby. Thus, any demand on the Directors would be futile.

159.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the defendant-Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Directors face a substantial likelihood of liability, they are self-interested and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

160.    The acts complained of herein constitute violations of fiduciary duties owed by Tempur Sealy's officers and directors, and these acts are incapable of ratification.

161.    The defendant-Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Tempur Sealy.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Directors were to sue themselves or certain of the officers of Tempur Sealy, there would be no directors' and officers' insurance

56

protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

162. If there is no directors' and officers' liability insurance, then the Directors will not cause Tempur Sealy to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

163. Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

164. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

165. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Tempur Sealy's business and affairs.

166. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

167. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Tempur Sealy.

168. In breach of their fiduciary duties owed to Tempur Sealy, the Individual Defendants willfully or recklessly caused the Company to issue false and misleading statements and/or omit

material facts to the detriment of the shareholders and the Company.  Moreover, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

169.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations.  The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Tempur Sealy's securities and disguising insider transactions.  Such material misrepresentations and omissions also led to the Company overpaying for repurchases of its own stock by more than $56 million.

170.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Tempur Sealy's securities and disguising insider transactions.

171.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

172.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Tempur Sealy has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

173.    Plaintiff on behalf of Tempur Sealy has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

174.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

175.    By their wrongful acts and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Tempur Sealy.

176.    The Individual Defendants either benefitted financially from the improper conduct, and received proceeds from insider sales, unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, similar compensation from Tempur Sealy that was tied to the performance or artificially inflated valuation of Tempur Sealy, and/or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

177.    Plaintiff, as a shareholder and a representative of Tempur Sealy, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

178.    Plaintiff on behalf of Tempur Sealy has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Abuse of Control

179.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

180.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Tempur Sealy, for which they are legally responsible.

181.    As a direct and proximate result of the Individual Defendants' abuse of control, Tempur Sealy has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Tempur Sealy has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

182.    Plaintiff on behalf of Tempur Sealy has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Gross Mismanagement

183.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

184.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Tempur Sealy in a manner consistent with the operations of a publicly-held corporation.

185.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Tempur Sealy has sustained and will continue to sustain significant damages.

186.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

187.    Plaintiff, on behalf of Tempur Sealy, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

188.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

189.    The Individual Defendants caused the Company to pay themselves excessive salaries, bonuses, fees, and stock grants to the detriment of the shareholders and the Company.

190.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Tempur Sealy to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to likely engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.  The Individual Defendants have also caused Tempur Sealy to lose more than $56 million dollars as a result of overpayment for repurchases of its own stock.

191.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

192.    Plaintiff on behalf of Tempur Sealy has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests and prays that this Court, sitting in equity and at law, enter a judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Tempur Sealy, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Tempur Sealy;

(c)     Determining and awarding to Tempur Sealy the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Tempur Sealy and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Tempur Sealy and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Tempur Sealy to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Tempur Sealy restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and

proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:  July 20, 2017                    Respectfully submitted,


                                         By: */s/ Erik D. Peterson*_____
                                         Erik D. Peterson
                                         **MEHR, FAIRBANKS & PETERSON**
                                           **TRIAL LAWYERS, PLLC**
                                         201 West Short Street, Suite 800
                                         Lexington, KY 40507
                                         Telephone: (859) 225-3731
                                         Facsimile: (859) 225-3830
                                         Email: edp@austinmehr.com

                                         *Local Counsel for Plaintiff*

                                         **THE ROSEN LAW FIRM, P.A.**
                                         Phillip Kim
                                         275 Madison Avenue, 34th Floor
                                         New York, NY 10016
                                         Telephone: (212) 686-1060
                                         Facsimile: (212) 202-3827
                                         Email: pkim@rosenlegal.com

                                         **THE BROWN LAW FIRM, P.C.**
                                         Timothy W. Brown
                                         240 Townsend Square
                                         Oyster Bay, NY 11771
                                         Telephone: (516) 922-5427
                                         Facsimile: (516) 344-6204
                                         Email: tbrown@thebrownlawfirm.net

                                         *Counsel for Plaintiff*